1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  DAVID R. CALLAWAY (CABN 121782)
   Assistant United States Attorneys
5
        150 Almaden Boulevard, Suite 900
6       San Jose, California 95113
        Telephone: (408) 535-5596
7       Facsimile: (408) 535-5066
        E-Mail: David.Callaway@usdoj.gov
8
   Attorneys for Plaintiff
9
                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12  UNITED STATES OF AMERICA,          )    No. CR 10-0494 EJD
                                       )
13          Plaintiff,                 )    **UNITED STATES' OPPOSITION TO**
                                       )    **DEFENDANT'S MOTION TO**
14     v.                              )    **SUPPRESS EVIDENCE**
                                       )
15  BRIAN DUNNING,                     )    Date:      March 25, 2013
                                       )    Time:      3:00 p.m.
16          Defendant.                 )
                                       )    Before The Honorable Edward J. Davila
17  _____)

18                          **INTRODUCTION**

19          On June 18, 2007, during the execution of a search warrant at his home/place of business,

20  defendant Brian Dunning – forty-one years old, married, the father of two, and the half-owner

21  and operator of a multimillion dollar business called Kessler's Flying Circus (KFC) – freely and

22  voluntarily consented to be interviewed by FBI Special Agent Lisa Miller.  Mr. Dunning did so

23  only after S/A Miller had advised him that he was not under arrest, that he was free to leave, and

24  that he was under no obligation to speak with her.[1]  The interview took place at the dining room

25  table in Mr. Dunning's spacious, expensive home.  S/A Miller never drew her weapon nor was it

26  _____

27      [1] Miller Decl. ¶¶ 3-4 ; Miller 302 at 1.  The Declaration of FBI Special Agent Lisa M.
    Miller ("Miller Decl.") is attached as Exhibit A.  Special Agent Miller's report of her interview
28  with Mr. Dunning ("Dunning 302") is attached as Exhibit B.

UNITED STATES' OPPOSITION TO
MOTION TO SUPPRESS EVIDENCE
CR 10-0494 EJD

1    exposed during the entire time she was in the Dunning residence.[2]

2        During this interview, Mr. Dunning made certain inculpatory statements – including that

3    users who downloaded his widget "were not aware that they had been 'cookiefied,' and that he

4    knew he was receiving credit (that is, payment) from eBay for traffic he did not direct to eBay[3] –

5    he also defended his actions, claiming that he did not believe he was doing anything illegal and

6    that he was simply taking advantage of a "stupid program."[4]  Mr. Dunning ended the interview

7    by willingly signing Consent to Search forms giving agents consent to search three vehicles and a

8    trailer, as well as a form granting agents permission to assume his online presence.[5]  At the end

9    of the interview, Mr. Dunning's wife, Lisa Dunning, thanked S/A Miller, told her that she

10   "trusted" her, and asked S/A Miller to "drive safe."[6]

11       Now, almost six years later, Mr. Dunning claims to have been coerced into speaking with

12   S/A Miller, and that although he was told that he was not under arrest, he "[does] not recall her

13   saying anything else concerning whether [he] could leave or decline to participate" in the

14   interview, and assumed he "had no choice but to remain sitting where the agents told [him] to

15   sit."[7]  (Mr. Dunning also gets a little carried away in his declaration, purporting to recall

16   statements allegedly being made by agents elsewhere in the house, even though S/A Miller, who

17   was sitting right there with him, has stated under oath that she did not hear them.[8])

18   _____

19      [2] Miller Decl. ¶ 3.

20      [3] Dunning 302 at 5.

21      [4] Dunning 302 at 3.

22      [5] Miller Decl. ¶ 6.

23      [6] Miller Decl. ¶ 9.

24      [7] Dunning Decl. ¶ 8.

25

26      [8] Miller Decl. ¶ 8 ("At no time . . . did I hear another agent threaten to knock down the door of the residence, make reference to the value of Mr. Dunning's home or furniture, or make

27   threatening statements regarding the seizure of Mr. Dunning's assets.  That conduct would have been unprofessional, unhelpful to my effort to establish the rapport necessary to conduct an

28   interview, and I would remember it if it had occurred.")

UNITED STATES' OPPOSITION TO
MOTION TO SUPPRESS EVIDENCE
CR 10-0494 EJD        2

1   In sum, this motion attempts to use the *Craighead* decision[9] to create a *per se* rule that

2   any questioning conducted in a defendant's home simultaneously with the execution of a search

3   warrant requires that *Miranda* warnings be given. But this is not the law: if a search warrant is

4   being executed in the same location where an interview is being conducted, there will *always* be

5   other armed agents around, their presence lending itself to a claim that the home has become a

6   "police-dominated" environment. A defendant will *always* be able to claim, regardless what the

7   agents told him, that he did not "feel" he was free to leave or terminate the interview. Using the

8   four *Craighead* factors as a guide, however, this motion is without merit and must be denied.

9                                    **ARGUMENT**

10          On January 30, 2013 – again, almost six years after the fact – Mr. Dunning now claims

11  that he "felt" he was "in custody" on June 18, 2007, and that his statements to the FBI were the

12  result of coercion. As a threshold matter, the court should discount much of Mr. Dunning's

13  declaration offered in support of this motion. First, it is dated more than five years after the

14  events he purports to describe. It is highly doubtful that he remembers all the details he recounts

15  (while claiming to be unable to recall whether he was advised that he was free to leave and did

16  not have to agree to an interview). Second, the defendant artfully tries to squeeze into the legal

17  analysis his supposed *subjective* (and totally conclusory) "feeling" that he was in custody, and

18  attempts to buttress that subjective impression with a declaration from his wife about what *she*

19  was feeling.[10]  Yet the Supreme Court has repeatedly made clear that the determination of

20  whether an individual was "in custody" depends on the objective circumstances of the

21  interrogation, not the defendant's subjective views (let alone those of his wife). *See, e.g.*,

22  *Stansbury v. California*, 511 U.S. 318, 323 (1994) (citations omitted).

23  **I.     THE LEGAL STANDARD**

24          *Miranda v. Arizona*, 384 U.S. 436 (1966), requires law enforcement, before initiating

25  questioning, to give certain warnings to individuals who are in "custody."  The paradigmatic

26

27          [9] *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008).

28          [10] I know I'm dating myself, but that old Morris Albert song comes to mind.

UNITED STATES' OPPOSITION TO
MOTION TO SUPPRESS EVIDENCE
CR 10-0494 EJD                        3

1   *Miranda* situation of custodial interrogation is when a person is arrested in his home or on the

2   street and whisked to a police station for questioning. *Howes v. Fields*, 132 S. Ct. 1181, 1190

3   (2012). However, there are also occasions when a person is in "custody" without a formal arrest.

4   In such situations, the person must *at least* suffer a "restraint on freedom of movement of the

5   degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994)

6   (citations omitted) (emphasis added); *United States v. Hudgens*, 798 F.2d 1234, 1236 (9th Cir.

7   1986) (same).

8          For *Miranda* purposes, "custody" is a term of art that specifies circumstances that are

9   thought generally to present a serious danger of coercion. *Howes*, 132 S. Ct. at 1189. The initial

10  step is determine whether, "in light of the objective circumstances of the interrogation . . . a

11  reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and

12  leave." *Id.* (internal quotation marks and citations omitted); *see also Stansbury*, 511 U.S. at 323

13  (stating that the "in custody" determination does not depend on "on the subjective views

14  harbored by either the interrogating officers or the person being questioned"). To do this, the

15  court must examine "*all* the circumstances surrounding the interrogation." *Howes*, 132 S. Ct. at

16  1189 (emphasis added).

17         The Supreme Court has made clear that whether an individual's freedom of movement

18  was curtailed is only the first step in the analysis, not the last. A court should also determine

19  "whether the relevant environment presents the same inherently coercive pressures as the type of

20  station house questioning at issue in *Miranda*." *Id.* at 1189-90. In fact, "[t]he police are required

21  to give *Miranda* warnings only where there has been such a restriction on a person's freedom as

22  to render him 'in custody'." *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (citation and

23  internal quotation marks omitted). Of course, "[a]ny interview of one suspected of a crime by a

24  police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is

25  part of a law enforcement system which may ultimately cause the suspect to be charged with a

26  crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

27         As noted above, the Supreme Court has held that a court should look to *all* the

28  circumstances surrounding the interrogation to determine if an individual is "in custody." *See,*

1   *e.g., Fields*, 132 S.Ct. at 1189. For an in-home interrogation, the Ninth Circuit has suggested the

2   following factors: "(1) the number of law enforcement personnel and whether they were armed;

3   (2) whether the suspect was at any point restrained, either by physical force or by threats; (3)

4   whether the suspect was isolated from others; and (4) whether the suspect was informed that he

5   was free to leave or terminate the interview, and the context in which any such statements were

6   made." *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).

7       These factors are not exhaustive, and other factors may be relevant as well. *Id.*

8   **II.   AT LEAST THREE OF THE FOUR *CRAIGHEAD* FACTORS FAVOR THE UNITED STATES AND, TAKEN TOGETHER, DEMONSTRATE THAT THE**

9   **DEFENDANT WAS NOT "IN CUSTODY" ON JUNE 18, 2007**

10       The Court must look at "all the circumstances" surrounding the interview of the

11   defendant on June 18, 2007 to determine if he was "in custody" including the factors set forth by

12   the Ninth Circuit as well as other relevant factors. A review of these circumstances demonstrates

13   that Mr. Dunning was not in custody on that day.[11]

14       1.   <u>The Number of Law Enforcement Personnel and Whether They Were Armed</u>

15       This is the factor that comes closest to weighing in the defendant's favor, but the

16   government would submit that it is also the factor to which this Court should give the least

17   weight, because it is, almost by definition, going to be present in every case in which in-home

18   questioning is conducted simultaneously with the execution of a search warrant. It is also a

19   factor the significance of which varies depending on the size of the residence. Mr. Dunning lived

20   with his family in a two-story residence in Laguna Niguel, California;[11] Ernest Craighead, by

21   contrast, lived in enlisted Air Force housing on Davis-Monthan Air Force Base in Tucson,

22

23

24

25   [11]Tellingly, the defendant never claims that his confession on June 18, 2007 was involuntary. An involuntary statement is obtained through "physical or psychological coercion

26   or by improper inducement so that the suspect's will was overborne." *Haynes v Washington*, 373 U.S. 503, 513-414 (1963).

27

28   [11] Both defense declarations allude to an upstairs, where the bedrooms and Mr. Dunning's home office were located.

1  Arizona.[12]  The *Craighead* panel also focused on the fact that the eight officers who were present

2  represented three different law enforcement agencies, which the panel found increased the

3  coercive effect of their presence.  Here, the FBI report (attached to Mr. Cook's declaration)

4  indicates only that there were nine FBI agents, including S/A Miller who was not visibly armed

5  or in uniform, plus four FBI technicians.[13]

6         Given that S/A Miller was not visibly armed, and technicians do not carry firearms, that

7  means that the FBI sent, at most, nine visibly armed agents into a residence that, using common

8  sense, had to have been significantly larger than the base housing afforded to Airman Craighead.

9  In sum, this factor, the government would submit, is very close to being a wash.  If it tilts at all in

10  Mr. Dunning's direction, it isn't by very much.

11         2.      Whether Mr. Dunning Was Restrained by Force or Threats

12         In analyzing this factor, the court in *Craighead* focused almost entirely on the fact that the

13  defendant was interviewed in a small, cramped storage room at the back of the house, where the

14  only way out was a door, blocked by a visibly-armed agent.  The situation during Mr. Dunning's

15  interview was very different: yes, he would have been handcuffed for approximately five minutes

16  immediately after the agents entered the house, while the residence was being secured.

17  Thereafter, his handcuffs were removed, and S/A Lisa Miller asked him (politely)[14] whether he

18  would be willing to speak with her.  He agreed, and they sat at his dining table, from which he

19

20

21

22  [12] *Craigshead*, 539 F.3d at 1078.

23  [13] The Dunnings also claim that an Orange County Deputy Sheriff was present.  The
government has not been able to confirm this (though it may be true).  Mr. Dunning does not

24  assert, however, that the presence of one non-FBI agent in any way affected his calculus
regarding whether he was free to leave or to decline the interview.  Indeed, based on Lisa

25  Dunning's declaration, it would appear that the deputy was exclusively engaged with her.  (Lisa

26  Dunning Decl. ¶ 7)

27  [14] This Court will have the opportunity to observe S/A Miller's demeanor in person, and
can evaluate for itself the likelihood that she would conduct an interview using threats or ill-

28  treatment.

1   admits that he "could see across the living room to the front entry area of the house."[15]  Mr.

2   Dunning was not jammed into a storage room the way Airman Craighead was.

3          Mr. Dunning makes much of the fact (he claims) that an agent, "this one dressed in

4   SWAT/combat attire with a visible and exposed holstered gun," was assigned to "guard [him]

5   and prevent [him] from leaving."  This claim will have to be vetted through cross-examination,

6   but S/A Miller does not recall it, and it would not make sense.  (Why would a female agent,

7   dressed in civilian clothes, not visibly armed, be assigned to conduct the interview, only to have

8   the subject's peace of mind disturbed by having stationing Darth Vader three steps away?)

9          Mr. Dunning also emphasizes the fact that he was escorted when he went to the kitchen to

10  get water, or to the bathroom.  But this hardly rises to the level of a formal arrest.  As Special

11  Agent Miller says in her declaration, she told Mr. Dunning, You're free to leave, but if you want

12  to stay here we will have to escort you.  The choice was his.

13         In any event, agents are free to impose minimal restrictions on individuals to ensure agent

14  safety, maintain the integrity of evidence, and maintain the status quo.  *See, e.g., Beheler*, 463

15  U.S. at 1125 (suspect is only "in custody" when their freedom of movement is restricted so much

16  that it amounts to a formal arrest); *Hudgens*, 798 F.2d at 1237 (even if suspect's freedom of

17  action is inhibited in some degree, *Miranda* warnings need not be given before questioning);

18  *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1982) (stating that strong but reasonable

19  measures to ensure the safety of officers or the public can be taken without necessarily

20  compelling a finding that the suspect was in custody); *United States v. Patterson*, 648 F.2d 625,

21  633 (9th Cir. 1981) (officers may take reasonable steps to maintain the status quo).

22         It is also highly significant that Lisa Dunning left the house not once, but twice, while the

23  agents were executing the search warrant.  By her own declaration (at ¶ 7), Mrs. Dunning left

24  once to walk the children to school, and was gone for thirty minutes.  She returned, then left

25  again to take Aunt Joy to the airport, and was gone approximately an hour.  It is also clear that

26  when she left, her husband could see that she was leaving ("On these occasions, when I was

27

28         [15] Brian Dunning Decl. ¶ 7.

UNITED STATES' OPPOSITION TO
MOTION TO SUPPRESS EVIDENCE
CR 10-0494 EJD                          7

1   permitted to leave the house, I noticed that the FBI agent questioning my husband would stop
2   talking when I was within view").

3       In sum, Mr. Dunning may have been restrained briefly while the agents were clearing the
4   residence, but that was for five minutes. After that, he was uncuffed and asked – not "directed,"
5   but rather asked – by Special Agent Lisa Miller whether he would be willing to speak with her.
6   He agreed. The interview was not the product of force, threats, or restraint. The fact that Mr.
7   Dunning could see his wife leave the house only reinforces this fact.[16]

8       3.   Whether Mr. Dunning Was Isolated From Others

9       Although he tries gamely, this is a hard one for Mr. Dunning to argue with a straight face.
10  The *Craighead* panel focused on the fact that Airman Craighead was not allowed to have anyone
11  with him in the small storage room where he was interviewed. Mr. Dunning, by contrast, was
12  interviewed in the dining room of his home, from which vantage point he could see, by his own
13  admission, everything that was going on (including, according to Mrs. Dunning's declaration, the
14  two times she was permitted to leave the residence). Both Mr. and Mrs. Dunning also
15  acknowledge that he was permitted to visit and comfort his children in the kitchen before the
16  interview began. This was not, in short, an interview in which the coercive effect was enhanced
17  by isolation.

18      Where a suspect is in familiar surroundings, the element of compulsion that concerned
19  the Supreme Court in *Miranda* is less likely to be present. *Orozco v. Texas*, 394 U.S. 324, 326
20  (1969). As the Ninth Circuit has stated, "An interview conducted in a suspect's . . . living room
21  . . . . might allow the suspect to take comfort in the familiar surroundings of the home and
22  decrease the sensation of being isolated in a police-dominated atmosphere." *Craighead*, 539
23  F.3d at 1088; *see also Beckwith v. United States*, 425 U.S. 341, 342-43 (1976) (holding that
24  defendant was not "in custody" when police arrived at his home at 8:00 a.m. and he was

25

26      [16] *See United States v. Gould*, 2013 WL 163287, *4 (N.D.Cal. Jan 15, 2013), in which
27  Judge D. Lowell Jensen, in denying a motion to suppress based on *Craighead*, found it
    significant that defendant's father was permitted to leave the residence and that the defendant
28  saw him leave.

UNITED STATES' OPPOSITION TO
MOTION TO SUPPRESS EVIDENCE
CR 10-0494 EJD                    8

1   interviewed at his dining room table).

2       4.      Whether Mr. Dunning Was Told He Was Free to Leave or Terminate the

3               Interview

4       Again, Mr. Dunning tries gamely, but this factor is a loser for him.  Special Agent Miller

5   has sworn under oath that she advised him (1) that he was not under arrest, (2) that he was free to

6   leave at any time, and (3) that he was not obligated to speak with her.  Mr. Dunning

7   acknowledges receiving the first advisement, but claims not to recall hearing the other two.  So

8   we have the recollection of a trained law enforcement agent, who wrote a report immediately

9   following the interview, against the failed recollection of a defendant who did not sign a

10  declaration until well over five years after the fact.

11      As the Ninth Circuit has recognized, this fact alone goes a long way to showing that a

12  defendant was not "in custody" for *Miranda*.  *See, e.g., Craighead*, 539 F.3d at 1087 ("If a law

13  enforcement officer informs the suspect that he is not under arrest, that [his] statements are

14  voluntary, and that he is free to leave at any time, this communication greatly reduces the chance

15  that a suspect will reasonably believe he is in custody.").[17]

16      Other factors that confirm Special Agent Miller's recollection are that the interview

17  ――――――――――――――――――――

18      [17]The defendant relies heavily on *United States v. Mittel-Carey*, 493 F.3d 36 (9th Cir.
    2007), claiming that it "factual[ly] similar" to this case. Def.'s Br., at 6 n.1; *see also id.* at 7, 9,
19  and 14.  That is incorrect for two major reasons. First, in that case, the court relied primarily on
    the "physical control" the agents exercised over Mittel-Carey. *See Mittel-Carey*, 493 F.3d at 40.
20  Agents never told Mittel-Carey that he was not detained; they ordered him to dress and go to a
    different part of his residence; they physically separated him from his girlfriend; they did not
21  allow him to speak to his girlfriend alone; and escorted him within his house on three different
    occasions (including when he fed his pet rabbit on the back porch).  In the instant case, Special
22  Agent Miller told the defendant that he was not under arrest, he was free to leave, and that he was
23  in no way obligated to speak to her.  Moreover, the defendant ran a business out of the search
    location.  Second, in *Mittel-Carey*, the court found that the "interrogating agent" made "coercive
24  statements . . . which seemed designed to elicit cooperation while carefully avoiding giving the
    defendant *Miranda* warnings."  Here, there is no evidence whatsoever of any coercive
25  statements: Mr. Dunning only claims that S/A Miller "ignored and evaded" his questions
26  regarding an attorney (Brian Dunning Decl. ¶ 10); S/A Miller, who does not recall the subject
    coming up at all, simply says that she would, as her standard practice, have *reiterated* that Mr.
27  Dunning was free to leave or to terminate the interview, but that the decision whether he needed
28  an attorney was not for her to make.

1   report reflects that Mr. Dunning was not browbeaten into a "confession;" rather, he made

2   numerous statements *defending* his conduct. This was not a cowering mass of jelly, but rather a

3   man who knew his rights and wanted to tell his side of the story. Next, as argued previously, Mr.

4   Dunning saw his wife leave the house – twice. There was absolutely nothing stopping him from

5   saying, "I'm not under arrest, right? Great, then this interview is over. I'm going with my wife

6   to take Aunt Joy to the airport." It is also important to recall that Dunning signed consent forms

7   for his vehicles and a pop-up trailer, plus he gave the agents permission to assume his online

8   identity. Those forms state, in writing, that he is not required to give consent.

9           Accordingly, given all the factors listed as possibly relevant by the Ninth Circuit, the

10  defendant was not "in custody" for *Miranda* purposes on June 18, 2007.

11                                   **CONCLUSION**

12          For the foregoing reasons, the United States respectfully requests that the Court deny the

13  defendant's motion to suppress evidence.

14  DATED: March 4, 2013

15                                          Respectfully submitted,

16                                          MELINDA HAAG
                                            United States Attorney
17
                                                    /s/
18

19                                          DAVID R. CALLAWAY
                                            Assistant United States Attorney
20

21

22

23

24

25

26

27

28

10

# EXHIBIT A

# DECLARATION OF LISA M. MILLER

I, Lisa M. Miller, do hereby declare and state:

1.      I have been a Special Agent (SA) of the Federal Bureau of Investigation ("FBI") for sixteen years. My initial training consisted of a sixteen (16) week FBI new agent's class during which I received instruction on various aspects of federal investigations. Subsequently, I have received hundreds of hours of training specific to the various federal violations which I have been assigned to investigate, as well as in the proper methods of executing federal search warrants and conducting subject interviews. I have participated in a wide variety of criminal investigations, to include those involving organized crime, cyber crime, crimes against children, and white collar crime.

2.      The FBI obtained a federal warrant authorizing the search of a residence located at 15 High Bluff, Laguna Niguel, California, the residence of Mr. Brian Dunning, defendant in the captioned matter, on June 18, 2007. I participated during the execution of this search warrant on June 18, 2007.

3.      At approximately 7:00a.m. on June 18, 2007, myself, and several other FBI agents knocked and announced our presence at 15 High Bluff, Laguna Niguel, California. Once inside the residence, consistent with FBI safety protocol, agents walked throughout the residence, systematically clearing each room until it could be determined that all present were accounted for. I was one of the last agents to enter the residence. I never drew my weapon nor was it exposed during the duration of my time in the residence. Contrary to Mr. Dunning's declaration, I believe the clearing process took about five minutes, not 15-20 minutes.

4.      Upon entry into the residence, Mr. Dunning was taken aside, handcuffed and searched for officer safety purposes. I also have never seen a person bent over a couch to be searched during my entire career; contrary to Mr. Dunning's declaration, that did not occur in my presence. Once the initial entry into the residence was complete – again, I estimate that this took approximately five minutes – Mr. Dunning's handcuffs were removed. I provided Mr. Dunning with a copy of the search warrant and advised him that he was not under arrest, he was free to leave, and that he was in no way obligated to talk to me. I asked Mr. Dunning for the opportunity to sit down and speak with him. When he agreed to do so, we sat down at Mr. Dunning's dining table.

5.      Mr. Dunning remained at the dining table with me for the duration of the search warrant. On occasion, when Mr. Dunning wished to retrieve a glass of water, speak to his wife and children, or use the restroom, he was accompanied by an agent. To ensure officer safety, as well as the safety of others present during the execution of a search warrant, it is standard FBI protocol to escort and not to allow individuals to roam freely throughout the premises during the course of a search warrant. I informed Mr. Dunning about this in advance. It is my standard practice to advise subjects in this situation that, although they are free to leave the premises if they wish, if they elect to stay they will need to be escorted at all times for officer safety.

6.      Mr. Dunning willingly continued to talk with me at length about his family, his education, his finances, and his business throughout the course of the search warrant. Mr. Dunning provided consent for agents to search three vehicles and a trailer, and signed a form giving agents consent to assume his online presence.

7.      At no time did Mr. Dunning ask to leave the premises, express a desire to stop the interview, or demand an attorney. As Mr. Dunning was not under arrest or being detained, I did not read him his Miranda rights. I do not recall Mr. Dunning asking me, as he claims in his declaration, whether he "needed" a lawyer. My standard practice, which I would have followed in this instance, is as follows: if a subject demands a lawyer or requests to stop the interview, I stop the interview immediately. If a subject asks my opinion whether he "needs" a lawyer, or makes some other reference to an attorney that falls short of affirmatively asking for one, I respond by reminding him that he is not under arrest, that he has not been charged with a crime, and that he is free to leave or terminate the interview whenever he likes, but that I cannot advise him whether to obtain a lawyer. That decision is up to him.

8.      At no time throughout the course of the search warrant did I hear another agent threaten to knock down the door of the residence, make reference to the value of Mr. Dunning's home or furniture, or make threatening statements regarding the seizure of Mr. Dunning's assets. That conduct would have been unprofessional, unhelpful to my effort to establish the rapport necessary to conduct an interview, and I would remember it if it had occurred. Moreover, I was the only agent to address the reasoning behind the search warrant with Mr. Dunning. No other agent, in my presence, responded to Mr. Dunning that he was charged with "wire fraud" or that he had "90% too many clicks," as he claims in his declaration.

9.      At the conclusion of the search warrant, as myself and the other agents were leaving the residence, Mr. Dunning's wife, Lisa Dunning, thanked me, told me that she trusted me, and told me to drive safely. The following day, June 19, 2007, I received an unsolicited telephone call from Lisa Dunning. During that telephone call, Mrs. Dunning advised that Sean Hogan was a "creep" and though they had yet to receive an actual threat from him, she and her husband feared that Mr. Hogan might put a hit out on them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February 6, 2013, at Oakland, California.

    / s /

Lisa M. Miller
Special Agent
Federal Bureau of Investigation[1]

---

[1] Note: this declaration was initially prepared and signed on February 6, 2013, but revised, over the phone, during a conversation with AUSA David R. Callaway on March 4, 2013. S/A Miller is out of the state and has not signed the attached version, but reviewed it by phone with AUSA Callaway and swears to it as if she had signed it.

# EXHIBIT B

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___06/19/2007___

    On June 18, 2007, BRIAN ANDREW DUNNING, date of birth
█████████ 1965, social security number █████████ home
telephone number █████████, California. After being advised of the
nature of the interview and the identities of the interviewing
agents, DUNNING provided the following information:

    The interview took place in conjunction with a federal
search warrant being executed at the residence. DUNNING was
provided with a copy of the search warrant and advised that he was
not under arrest or being detained in any way. SA Miller explained
to DUNNING that she would like to interview him but that he was not
obligated to participate.

    DUNNING resides with his wife, LISA DUNNING and their two
children, ANDREW DUNNING (7 years old) and ERICA DUNNING (9 years
old). The DUNNING's have lived in their current residence since
2002.

    DUNNING advised that there were eleven computers in the
residence. His wife and each child have their own computer, he has
six computers in his home office, and there are two spare
computers. DUNNING maintains a "development server" in his home,
which is a model of the servers he leases at Rackspace, a high-end
managed server facility in San Antonio, Texas. DUNNING uses
PacBell DSL as his ISP. DUNNING recognized the two Internet
Protocol (IP) addresses in the search warrant as being those of his
servers in San Antonio. DUNNING is not an experienced
administrator. He depends on the employees at Rackspace to do most
of his technical server work. DUNNING has a Treo mobile phone that
he rarely uses to access the Internet.

    DUNNING advised that he has had very little formal
education. After high school he attended BYU for one year before
returning to California where he took several classes from both
UCLA and UC Irvine. While attending college classes, DUNNING and
his brother TODD DUNNING (hereafter "TODD") started a t-shirt
screening business. The business became successful and DUNNING
decided his time would be better spent running the business full
time. It was at that point that he quit college. DUNNING realized
that what he most enjoyed about the business was writing software

Investigation on __06/18/2007__ at __Laguna Niguel, California__

File # █████████      Date dictated _____

by   SA Lisa M. Miller /
    SA R.W. Simpson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



Continuation of FD-302 of _____Brian Andrew Dunning_____ , On __06/19/2007__ , Page ___2___

programs and eventually dropped the t-shirt business and went into software consulting full time. He does not have a college degree, nor does he have any formal training in computer science or any such technical field. DUNNING's expertise is in Filemaker Pro, which he learned on his own. He is currently writing an article about Filemaker Pro, which he intends to have published.

DUNNING advised that TODD had Attention Deficit Disorder (ADD) and was on several medications. At times, TODD exhibits odd or bizarre behavior which DUNNING attributes to the disorder and the medication.

DUNNING employs a man named AIDEN LAST NAME UNKNOWN (LNU) to assist with some of the more technical aspects of his business. In addition, he pays his wife a salary of $10,000 a month for administrative work and both his mother and mother-in-law approximately $2,500 a month to assist with their living expenses. DUNNING advised that AIDEN LNU is not involved personally or professionally with the eBay Affiliate Program.

DUNNING works from home. He has a corporation named Thunderwood Holdings. DUNNING runs a website called briandunning.com from which he advertises his software consulting services and offers free tools for download such as zipcode database tools, Filemaker Pro development tools and tools for making barcodes. DUNNING maintains two additional domains, zipwise.com and totwise.com.

DUNNING and TODD began dabbling in affiliate marketing by joining eBay's Affiliate Program, through Commission Junction, in approximately 2005 through a corporation they named "Kessler's Flying Circus", a reference from the movie "Great Waldo Pepper". DUNNING advised that he and TODD formed a partnership because with a "tier based" system, they could reach higher levels together than they could on their own. They split all proceeds from the affiliate program in half between the two of them. DUNNING advised that any money he and TODD make from eBay's affiliate marketing program is directly wired to his Kessler's Flying Circus account at Wells Fargo Bank. He leaves enough money in the account to pay for leasing his servers in San Antonio and splits the remaining balance evenly between himself and TODD.

DUNNING estimated that he made approximately $200,000 to $300,000 from his consulting business in 2005. With the addition of the money he made from the eBay Affiliate Program, DUNNING



Continuation of FD-302 of     <u>Brian Andrew Dunning</u>     , On <u>06/19/2007</u> , Page <u>3</u>

stated that he claimed an income of approximately $1.2 million on his taxes in 2006. He has used the additional income to pay off his house and vehicles, as well as set up college funds for his two children.

DUNNING advised that TODD used to make an income from website development but that he did not believe that was still the case. TODD's current income is solely derived from the eBay Affiliate Program. TODD has used his income from the Affiliate Program to purchase "toys".

DUNNING recognized SEAN HOGAN from a photo shown to him by SA Miller. DUNNING stated that he has known HOGAN for approximately ten years and considers him a mentor. Although he once proposed the concept, DUNNING and HOGAN have never been in business together. They run in the same circles and have seen each other face to face on only six or seven occasions. They frequently communicate via email and telephone, sharing ideas and concepts. DUNNING advised that though some of his tools and programs are similar to HOGAN's, this is merely coincidence. DUNNING has never copied or stolen from HOGAN, but stated that he would not be surprised if HOGAN said he did. HOGAN has a business called Digitalpoint.com.

DUNNING advised that he and TODD participate in the Affiliate Program in much the same manner HOGAN does. He believes that they are "taking advantage" of the program by exploiting its weaknesses. DUNNING does not believe that he, TODD or HOGAN have done anything that could be construed as illegal. They operate within the "gray area" while staying within the program's terms of service.

DUNNING stated that he has too much to lose and would never chance that by doing anything illegal. He and TODD intended to be in the Affiliate Program for the long haul and would not engage in behavior that could get them thrown out of the program. He believes the two of them deserve kudos for finding a "clever" method to take advantage of a "stupid program". DUNNING stated that eBay does not need an Affiliate Program in that the average person visits eBay and engages in transactions on a fairly regular basis and would do so with or without such a program.

DUNNING purposefully engaged in "cookie stuffing" when he started in the Affiliate Program. He did so by placing a 1 x 1 pixel, which forced an eBay cookie with his affiliate information,



Continuation of FD-302 of ____Brian Andrew Dunning_____, On _06/19/2007____, Page ___4___

even though the user did not click to redirect to the eBay site, on
an ad located on his widget, wholinked.com. DUNNING was paid money
through the Affiliate Program for this, but could not recall how
much or for what period of time. He ceased this activity
temporarily when he was warned by his contact at Commission
Junction that what he was doing was not within their terms of
service.

DUNNING could not recall an exact time frame, but advised
that at one point HOGAN called him to advise that an inside contact
at eBay had told him that eBay had detected DUNNING's cookie
stuffing. HOGAN offered to help DUNNING by teaching him how to
better mask the activity. DUNNING traveled to HOGAN's residence in
San Diego and the two men spent the day playing War Craft and
discussing techniques for masking activity that could be labeled as
being outside the Affiliate Program's terms of service.

HOGAN provided DUNNING with his code and walked him
through a program he created which enabled him to determine whether
or not a user could accept a third party cookie. DUNNING didn't
understand why this addition to the code was necessary. He took
the code from HOGAN with the intention of studying it, but to date
has not done so. The code provided to DUNNING by HOGAN is on
DUNNING's computer desktop. DUNNING advised that he was not clear
as to why HOGAN gave him the code. DUNNING did not pay for the
code and assumed that HOGAN just wanted him to have it for some
reason. While at HOGAN's residence in San Diego, HOGAN told
DUNNING that HOGAN was the subject of a FBI investigation involving
the illegal pirating of motion pictures. DUNNING estimated that he
currently talks to HOGAN approximately once a month.

After his warning from HOGAN that eBay was aware of his
methods, DUNNING and TODD made a decision to revamp their
techniques. They developed a method of spreading their 1x1 pixel
not by relying on search engines for traffic, which they felt gave
them little or no power, but by spreading it via software
applications, or widgets, they developed. DUNNING explained that
widgets spread virally, making he and TODD in charge of their own
destiny.

DUNNING developed two widgets, available to users free of
charge, in which he placed his 1x1 pixel; "profilemaps" for use on
MySpace.com, and "wholinked" for use in the blogger community.
Profilemaps can be used on a MySpace page to geographically track
visitors to a particular page. Wholinked is a tool bloggers can



Continuation of FD-302 of ____Brian Andrew Dunning_____ , On _06/19/2007_ , Page __5__

use to post a list of links on a bulletin or message board.
DUNNING's priority was to make sure users who downloaded his
widgets were not aware that they had been "cookiefied".

DUNNING advised that the only change he made to the 1x1
pixel prior to connecting it to the widgets was one that would take
a user from anywhere in the world and direct them to the country
appropriate eBay site. His previous version directed all users,
regardless of country to eBay's home page in the United States.

DUNNING is aware that by using the 1x1 pixel in the
widgets he is receiving credit in the Affiliate Program for users
that may not be going to the eBay site as a result of his business.
He believes the Affiliate Program is "stupid and illogical and
unnecessary".

Since making the change to the widgets, DUNNING has seen
his income for the Affiliate Program grow extensively. DUNNING has
been completely open with eBay about the methods he uses to earn
money in the Affiliate Program. He intended to request that eBay
provide him with a written statement acknowledging that they
understood and supported his methods.

On numerous occasions, DUNNING explained his methods to
Commission Junction employee CHRISTINE KEMP ("CJ"), who provided
him with a verbal ok to continue.

In the early months of his involvement with the Affiliate
Program, a former employee of DUNNING's, ANDREW WEY (phonetic),
worked at Commission Junction and provided DUNNING with inside
information regarding how to take advantage of the Affiliate
Program. During those months DUNNING paid WEY ten percent of the
money he made from the program. WEY was only employed by
Commission Junction for a few months.

DUNNING advised that TODD had once called eBay to report
misconduct by HOGAN. DUNNING believed that TODD did this during
one of his "episodes" when he was jealous that HOGAN was employing
similar methods to theirs but making significantly more money.
DUNNING made TODD call back several months later and retract his
statements feeling it was not their place to "rat out a friend".

DUNNING advised that all money he receives from the
Affiliate Program is directly wired from Commission Junction to his
Kessler's Flying Circus Wells Fargo bank account. He then



Continuation of FD-302 of ____Brian Andrew Dunning_____ , On __06/19/2007__ , Page __6__

transfers his half of that money between three other Wells Fargo
accounts; his Thunderwood account and his and his wife's personal
checking and brokerage accounts.  He estimated that the current
balances in his accounts were as follows:

Kessler's Flying Circus:   $5,000 to $10,000
Thunderwood:               $25,000
Personal Checking:         $50,000 to $75,000
Brokerage:                 $500,000

      DUNNING maintains all of his finances on Quicken.  His
Quicken password is ▬▬▬▬▬ or ▬▬▬▬▬▬

      DUNNING signed a Consent to Search form giving agents
consent to search his three vehicles and RV.

      The Property Receipts, Consent to Search form and Consent
to Assume Online Identity signed by DUNNING are maintained in the
1A section of the file.